IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TRACEY L. GOGA, | ) |
| | ) |
|     Plaintiff | ) |
| | )   Civil Action No. 10-1749 |
|     v. | ) |
| | )   Judge Nora Barry Fischer |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
|     Defendant | ) |

# **MEMORANDUM OPINION**

## I. INTRODUCTION

Tracey L. Goga ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 - 1383f ("Act"). This matter comes before the court on cross motions for summary judgment. (ECF Nos. 8, 10). The record has been developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Judgment is GRANTED.

## II. PROCEDURAL HISTORY

Plaintiff filed for SSI with the Social Security Administration on October 24, 2007, claiming an inability to work due to disability as of August 24, 2005. (R. at 54)[1]. Plaintiff was initially denied benefits on March 31, 2008. (R. at 54). A hearing was scheduled for November 20, 2008, and Plaintiff appeared to testify represented by counsel. (R. at 54). A vocational expert also testified. (R. at 54). The Administrative Law Judge ("ALJ") issued a decision denying benefits to Plaintiff on March 17, 2009. (R. at 54 - 62). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which request was denied on December 2, 2010, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 1 – 5).

Plaintiff filed her Complaint in this court on December 28, 2010. (ECF No. 3). Defendant filed his Answer on March 4, 2011. (ECF No. 5). Cross motions for summary judgment followed. (ECF Nos. 8, 10).

## III. STATEMENT OF FACTS

The facts relevant to the present case are limited to those records that were available to the ALJ when rendering his decision. (R. at 4 – 5). All other records newly submitted[2] to the Appeals Council or this court will not be considered, here, and will not inform the decision of this court. *See Matthews v. Apfel*, 239 F.3d 589, 592, 594 – 95 (3d Cir. 2001).[3]

---

[1] Citations to ECF Nos. 6 – 6-9, the Record, *hereinafter*, "R. at __."

[2] Exhibits 9E, 21F; R. at 179 – 82, 493 – 611.

[3] The Appeals Council may decline review of a claimant's case when the ALJ's decision is not at odds with the weight of the evidence on record. *Matthews*, 239 F.3d at 592. In such a case, a district court can only review that evidence upon which the ALJ based his or her decision. *Id.* at 594 – 95. As a result, new evidence presented by a claimant to the Appeals Council, but not reviewed, is not within the purview of a district court when judging whether substantial evidence supported an ALJ's determination. *Id.* Such is the case at present. (cont.)

### A. Plaintiff's Personal Background

Plaintiff was born on September 22, 1969. (R. at 119). Plaintiff was divorced and she had three children, but did not have custody.[4] (R. at 14). In her own opinion, Plaintiff could not properly care for her children. (R. at 40). Her primary source of income was her family, and public assistance which provided her with $195.00, monthly. (R. at 15, 121). Plaintiff also received food stamps. (R. at 121). Plaintiff quit high school in tenth grade due to her pregnancy, but she subsequently earned her GED in 1991. (R. at 141, 198). Plaintiff lived in an apartment with her boyfriend who helped her clean and do laundry. (R. at 145). Plaintiff stated that she was limited in lifting, squatting, bending, standing, reaching, walking, kneeling, and stair climbing as a result of a motorcycle accident in 2005. (R. at 148).

### B. Plaintiff's Medical Background

On May 1, 2003, Plaintiff was treated and released from Sharon Regional Health System, in Sharon, Pennsylvania after she attempted to commit suicide by starting her car while parked in the garage with the garage door closed. (R. at 196). In addition to being treated for carbon monoxide poisoning, Plaintiff was treated for depression, anxiety and domestic violence. (R. at 209). At the time of treatment, Plaintiff denied that she was suffering from depression, but she admitted to increased anxiety which she attributed to a fear of increased responsibility and an inability to handle matters on her own. *Id*. Plaintiff reported a history of both verbal and physical abuse from her husband as well as past sexual abuse which she experienced as a teenager. (R. at 196). Plaintiff denied recreational drug use and all tests for same returned

---

Additionally, Plaintiff failed to make the required showing under *Szuback v. Secretary of Health and Human Services*, 745 F.2d 831 (3d Cir. 1984), for remand to reconsider the case in light of newly submitted evidence not considered by the ALJ when making his decision. Therefore, the case will not be remanded for this purpose, and Exhibits 9E and 21F (R. at 179 – 82, 493 – 611) will not be discussed.

[4] Plaintiff stated that she does not have custody of her children because she did not go to the custody hearing. (R. at 26). Plaintiff said that she tried to commit suicide by slitting her wrists. *Id*. She also drank alcohol frequently. *Id*.

negative. (R. at 192, 98). However, Plaintiff had consumed four or five beers prior to her attempted suicide and she had consumed beer regularly a "couple times a week." (R. at 196-97).

Dr. James Shaer at St. Elizabeth Health Center in Youngstown, Ohio performed surgery on Plaintiff on August 23, 2005 for a right 3A open tibia and fibula fracture as a result of a motorcycle accident. (R. at 278). At the time of the crash Plaintiff was intoxicated. (R. at 273, 78). On December 13, 2005, Dr. Shaer removed a protruding surgical screw from Plaintiff's right ankle. (R. at 258). Dr. Shaer noted that Plaintiff's fibula fracture had healed and that there was no indication of additional hardware loosening. *Id.* Plaintiff did not complain of pain at that time. (R. at 252).

Dr. Shaer removed plates from Plaintiff's right fibula on February 3, 2006. (R. at 250). Following Plaintiff's surgery on December 13, 2005, she began to develop pain in the area surrounding her right fibula. (R.at 252). Upon utilization of a WBC-tagged[5] bone scan, Dr. Shaer discovered signal uptake around the right fibula and elected to remove two additional surgical screws from her right fibula. *Id.* Dr. Shaer then prescribed vancomycin and doxycycline to treat a newfound MRSA[6] infection. (R. at 251-54). Plaintiff was to keep her leg elevated as much as possible while healing, but could bear weight, as tolerated. (R. at 253).

Plaintiff would return to Dr. Shaer, complaining of leg pain over one year after her right tibia fracture and related symptomology had been "resolved." (R. at 239). On June 19, 2007, Dr. Shaer removed additional plates from Plaintiff's right tibia. (R. at 239). Plaintiff complained of pain throughout her entire right leg. *Id.* Dr. Shaer conducted another WBC-tagged bone scan, which revealed no sign of infection. *Id*. However, Dr. Shaer elected to

---

[5] "WBC" is an abbreviation for white blood cell. STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

[6] "MRSA" is an abbreviation for methicillin-resistant *Staphylocossus aureus*. STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006). *Staphylocossus aureus* is a common bacteria often found on nasal mucous membrane and skin. *Id*.

4

remove the remaining screws in Plaintiff's tibia. *Id.* Dr. Shaer completed the surgery and instructed Plaintiff to bear weight, as tolerated, on the right leg. (R. at 240). Following surgery, Plaintiff reported that she no longer experienced pain. (R. at 294). Dr. Shaer recommended that Plaintiff continue with her daily activities. *Id*. In a January 11, 2008 Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities, Dr. Shaer made no specific limitations findings. (R. at 301 – 02). He stated only that Plaintiff could stand, walk, sit, and engage in postural activities and other physical functions, "as tolerated." (R. at 301 – 02).

Between July 20, 2006 and October 14, 2008 Plaintiff visited the Sharon Community Health Center – somewhat regularly – every two weeks for psychiatric sessions with Dr. Christian Kcompt. (R. at 303 – 48, 354 – 59, 435 – 53). Her most frequent diagnoses were bipolar disorder and anxiety, and treatment notes indicated that she complained of severe anxiety. *Id.* However, medical findings usually noted that Plaintiff was stable and making progress. *Id.* She was typically without suicidal ideations or plans. *Id.* She was regularly provided prescription medication for management of her mental condition. *Id.* Plaintiff did not complain of medication side-effects until later in the therapeutic record – on or around April 26, 2007. *Id.*

Dr. Kcompt assessed Plaintiff's functional capabilities on January 28, 2007. (R. at 354 – 59). Plaintiff was diagnosed with bipolar disorder and anxiety, and had sad affect. *Id.* However, the report indicated that Plaintiff's mood, concentration, and memory were, "ok." *Id.* Her behavior, psychomotor activity, appropriateness, stream of thought, thought content, fund of information and intelligence, remote and recent memory, and her immediate retention and recall were all within normal limits. *Id.* Plaintiff's impulse control, insight, and judgment were "fair." *Id.* Plaintiff did not have difficulty performing daily tasks, such as: shopping, cooking, cleaning,

maintaining a residence, paying bills, personal care, health, and hygiene. *Id*. The psychiatric report did provide that Plaintiff suffered panic attacks between two and three times a week and that these attacks were severe. *Id.*

Despite the relatively unremarkable findings in the preceding portion of Dr. Kcompt's assessment, it was later noted that Plaintiff's anxiety was capable of substantially interfering with her ability to sustain a daily routine and work-related activities, and to interact with co-workers or the general public. *Id.* Dr. Kcompt thereafter indicated that – as a direct result of her severe anxiety – Plaintiff would experience marked to extreme limitation in all aspects of functioning. *Id.*

On February 25, 2008, Dr. Robert P. Craig examined Plaintiff and diagnosed her with chronic depression and anxiety. (R. at 360 – 63). In addition, Dr. Craig noted that Plaintiff suffered from symptoms of post-traumatic stress disorder ("PTSD"). *Id*. Dr. Craig believed that Plaintiff's encephalitis,[7] history of emotional and marital problems, and a history of sexual abuse and rape contributed to her condition. *Id.* At the time of the appointment, Plaintiff was still suffering from symptoms of PTSD, including flashbacks while she slept, anxiety, depression, appetite problems, and low energy levels. *Id.* Plaintiff had limited social interaction. *Id.* She complained of little progress in her outpatient therapy. *Id.*

Dr. Craig described Plaintiff as "quite well groomed," and noticed no physical abnormalities. *Id.* She ambulated to the examination without difficulty. *Id.* Her attention, concentration, motivation, and self-sufficiency were all good. *Id.* She was thoughtful and detailed when answering questions. *Id.* She did not exhibit suicidal ideation. *Id.* He reported that she was able to earn a GED; however, she could not spell words backwards and struggled

---

[7] Encephalitis is inflammation of the brain. STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

with simple multiplication. *Id.* Plaintiff was capable of answering simple similarity questions. *Id.* She could also remember five digits forward and three digits backward. *Id.* Her response to test judgment situations was appropriate. *Id.* Dr. Craig noted that Plaintiff was capable of cooking and cleaning in the home, providing childcare, and handling money. *Id.* Her prognosis was fair, "at best." *Id.* She was assessed a global assessment of functioning ("GAF") score of 45.[8]

Douglas Schiller Ph.D. completed a Mental Functional Capacity Assessment on March 10, 2008. (R. at 364 – 67). The assessment indicated that Plaintiff suffered from affective disorders and anxiety-related disorders. *Id*. Dr. Schiller determined that the limitations resulting from these impairments did not appear to preclude Plaintiff from meeting the basic mental demands of a competitive work environment. *Id.* Dr. Schiller provided that Plaintiff was capable of carrying out short and simple instructions and that she experienced no restrictions with basic understanding and memory. *Id.* In Dr. Schiller's estimation, Plaintiff's claims in regard to her limitations were only partially credible. *Id.* Further, Dr. Schiller opined that Dr. Kcompt overestimated the degree of Plaintiff's functional limitation in his January 28, 2008 report, and that his limitations findings were inconsistent with the medical record. *Id.*

Dr. Schiller gave great weight to the findings of Dr. Craig. *Id.* He also concluded that Plaintiff was only moderately limited in her ability to maintain attention and concentration for

---

[8] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood"; of 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., ... suicidal preoccupation)" or "inability to function in almost all areas ...; of 20 "[s]ome danger of hurting self or others ... or occasionally fails to maintain minimal personal hygiene ... or gross impairment in communication...." *Id.*

7

extended periods, perform activities within a schedule, maintain regular attendance, and be punctual, complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism, respond appropriately to changes in work setting, and set realistic goals or make plans independently of others. *Id.* Plaintiff was otherwise not limited. *Id.*

Plaintiff received a psychosocial assessment at St. Anthony's Point between May 7, 2008 and May 15, 2008. (R. at 381). Plaintiff reported feelings of hopelessness and complained of her domestic situation with her ex-husband. (R. at 381-82). Plaintiff stated that her ex-husband was mentally, physically, and verbally abusive. (R. at 381). The assessment stated that Plaintiff was raped at age thirteen, "left home" at age fourteen, and was married by the age of sixteen. (R. at 381). Plaintiff's father was her main social support. (R. at 382). Plaintiff's mother and sisters did not understand her psychological issues and often told her to "get over it." (R. at 382). Moreover, the assessment provided that Plaintiff experienced frequent negative thoughts and had low self-confidence. (R. at 384).

Between June 6, 2008 and June 11, 2008, Dr. Ernest Swanson examined Plaintiff in regard to swelling and pain emanating from her right leg, which stemmed from her previous motorcycle accident. (R. at 393). A musculoskeletal examination revealed that the swelling in Plaintiff's right leg was the result of a muscle herniation. (R. at 394). Dr. Swanson informed Plaintiff that a procedure to repair the condition would be complex. *Id.* Instead, Dr. Swanson instructed Plaintiff to wear a "Jobst" stocking in an attempt to decrease the swelling in her right leg. *Id.* A bone scan showed no evidence of acute infection, but Dr. Swanson suspected possible chronic infection. (R. at 394).

An x-ray of Plaintiff's lumbar spine in early May of 2008 showed Plaintiff's spine maintaining alignment, without evidence of fracture or degenerative arthritis, and with preserved disc spaces. (R. at 403). However, Plaintiff was treated at Sharon Regional Health System between June 4, 2008 and September 22, 2008 for back pain and spasms, which she believed resulted from picking up her grandchild. (R. at 395). Plaintiff also complained of bad headaches and migraines. (R. at 396). The treatment notes explained that Plaintiff's back pain was the result of a central disc herniation of L5/S1 and that she had begun physical therapy. (R. at 398, 405).

Between May 22, 2008 and July 14, 2008, Plaintiff treated at the Rehab Center, in Hermitage, Pennsylvania, for constant right lower thoracic and lumbar pain. (R. at 492). Plaintiff was treated by physical therapist Susan K. Miller, who prescribed a treatment regimen of modalities and therapeutic exercise. (R. at 492). As the treatment progressed, Ms. Miller observed that Plaintiff's complaints of pain were inconsistent. (R. at 488). Plaintiff was not compliant with recommended activities, and engaged in walking and lifting beyond her recommended tolerances, resulting in increased pain. (R. at 485, 488).

Plaintiff would feign and exaggerate her difficulties with ambulating; when therapy staff observed Plaintiff without her knowledge, Plaintiff walked without a limp or gait deviations. (R. at 486, 488). Plaintiff was noted to behave differently when she was aware that therapy staff was observing her; her behaviors when she was unaware she was being observed were inconsistent with her complaints of pain. (R. at 488). Ms. Miller ultimately recommended that Plaintiff discontinue physical therapy and consult social/behavioral health services to help with her living/financial situations. *Id.* Plaintiff's prognosis was only "fair," because of her history of

9

non-compliance with a home therapy program and failure to avoid pain-inducing activities. (R. at 489).

### C. Administrative Hearing

At the hearing, Plaintiff testified that she lived on her own, and was able to go shopping for groceries. (R. at 16, 33). Plaintiff was able to drive a car, but sometimes felt as though people were following her, and she would become anxious if there was a lot of traffic. *Id*. Her father paid her rent, but she was responsible for her electricity, cable, and phone bills. (R. at 29).

Plaintiff previously worked for her ex-husband's landscaping company as the secretary/treasurer, beginning in 1989. (R. at 17-18). She divorced her husband in 2007. (R. at 18). Due to her martial problems, Plaintiff worked as a clerk in her parents' print shop in 2005. *Id*. Plaintiff's duties included collating books, shipping books, stocking paper on shelves, making copies, and waiting on customers. (R. at 19). Plaintiff left this job on August 24, 2005 due to her decreasing mental stability and because she was in a motorcycle accident. (R. at 20). Plaintiff stated that she had not attempted to find work because her psychiatrist diagnosed her as being bipolar and she was heavily medicated. (R. at 21). Plaintiff believed that her severe mood swings affected her ability to work, because she could become angry and very exhausted. (R. at 22).

Plaintiff sought counseling for her mood swings, but stopped her sessions for a few months because she felt that she was not improving. (R. at 23). At the time of the hearing, she testified that she was on various medications, including Celexa, Klonopin, Trazodone, Remeron, and Lamictal. (R. at 24-25). Plaintiff did not feel as though the medications helped any of her conditions. (R. at 25). In addition, Plaintiff wore a back brace and support stocking for her right leg. (R. at 33-34).

Plaintiff testified that she was not able to sit continuously for eight hours because of her back and leg problems. (R. at 34). Moreover, Plaintiff believed that she could not work an eight hour day due to her anxiety and bad memory. (R. at 34-35). Plaintiff experienced physical pain in her pelvic area, lower back, right buttock, and right leg. (R. at 36). She felt this pain every day. (R. at 39). She testified that she could only remain in a seated position for an hour at a time, and that she needed to lay down between ninety minutes and four hours, daily. (R. at 36). Further, Plaintiff had experienced increasing tension headaches and migraines, which made her nauseous. (R. at 37). She took Imitrex for her headaches, but it made her drowsy, tired, and shaky. *Id*.

Following Plaintiff's testimony, the ALJ asked the vocational expert ("VE") whether work existed for a hypothetical individual of Plaintiff's age, educational background, and work experience with no exertional limitations, but otherwise limited to occupations not involving detailed or complex tasks, interaction with the public, and more than occasional interaction with co-workers. (R. at 42). The VE stated that the individual could work as a, "laundry worker," with over 200,000 positions available in the national economy, as a, "marker," with one million positions available, and, "document preparer" with over one million positions available. *Id*.

The ALJ added the following limitations: work not requiring quotas or lifting more than twenty pounds, and involving sitting for six to eight hours of an eight hour workday. (R. at 43). The VE responded that the hypothetical person could perform the job of an, "addresser," with 200,000 positions available, and "telephone quotation clerk," with over one million positions available. (R. at 43). However, the VE stated that the hypothetical person could not engage in substantial gainful activity if she was required to be re-directed to tasks throughout the work day.

(R. at 43-44). The hypothetical person also could not miss more than one half to one day of work per month. (R. at 44).

## IV. STANDARD OF REVIEW

Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g)[9] and 1383(c)(3)[10]. Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based, and the court will review the record as a whole. *See* 5 U.S.C. §706. When reviewing a decision, the district court's role is limited to determining whether substantial evidence exists in the record to support an ALJ's findings of fact. *Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)(quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of

---

[9] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[10] Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F.Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). In short, the court can only test the adequacy of an ALJ's decision based upon the rationale explicitly provided by the ALJ; the court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986).

To be eligible for social security benefits under the Act, a claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986). The ALJ must utilize a five-step sequential analysis when evaluating whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can

perform any other work which exists in the national economy. 20 C.F.R. §404.1520(a)(4). *See Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

## V.  DISCUSSION

The ALJ concluded that Plaintiff had medically determinable severe impairments in the way of depressive disorder, bipolar disorder, and status post fracture of the right tibia. (R. at 56). It was determined that Plaintiff was not disabled because she had the functional capacity to perform sedentary work, except that she could not engage in detailed or complex tasks, could not have interaction with the public, could have only occasional interaction with co-workers, and was only able to lift up to twenty pounds, occasionally. (R. at 57 – 58). Consistent with the testimony of the vocational expert, Plaintiff was capable of performing a significant number of jobs in existence in the national economy. (R. at 42 – 44, 61).

Plaintiff objects to the determination of the ALJ, arguing he erred in failing to recognize all of Plaintiff's severe impairments at Step 2, in failing to accord Plaintiff's subjective complaints appropriate weight, in failing to properly analyze the medical evidence on record, and – as a result of the above errors – in relying upon a flawed hypothetical question and residual functional capacity ("RFC") assessment. (ECF No. 9 at 14 – 21). With respect to the first objection, Plaintiff specifically argues that the ALJ should have determined that her back ailments were a severe impairment. (ECF No. 9 at 14 – 15). As pointed out by Defendant,

Plaintiff's claim lacks merit. (ECF No. 11 at 9 – 10). It is clear from the medical record that Plaintiff suffered back pain. While the ALJ did not specifically determine Plaintiff's back condition to be a severe impairment, he still explicitly considered it in his analysis of Plaintiff's functional capacity, and accommodated what he considered to be the credible extent of Plaintiff's limitations attributable to her back pain. (R. at 58 – 59). Further, Plaintiff points to no evidence in the medical record available to the ALJ at the time of his decision, which implied functional limitations from back pain.

As was pointed out by the ALJ, Plaintiff's medical history did not support the severity of her claims; her doctors did not note any resulting functional limitations, she performed a number of daily activities, and treatment notes covering a period in which Plaintiff engaged in physical therapy for her back pain showed Plaintiff's complaints of pain to be out of proportion to her actual physical symptoms. (R. at 58 – 59). Even if the ALJ improperly failed to include a back condition amongst his list of Plaintiff's severe impairments, his error was harmless, because Plaintiff fails to illustrate that Plaintiff's credible limitations attributable to her back pain were not adequately accommodated. Plaintiff's first argument, therefore, fails.

Plaintiff next argues that the ALJ improperly dismissed the severity of Plaintiff's subjective complaints of pain and limitation, and erred when relying upon Plaintiff's activities of daily living to determine her functional capacity. Plaintiff's argument, again, lacks merit. An ALJ should accord subjective complaints of pain the same treatment as objective medical reports, and weigh the evidence before him. *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 122 (3d Cir. 2000). Serious consideration must be given to subjective complaints of pain where a medical condition could reasonably produce such pain. *Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993). Moreover, there need not be objective evidence of a subjective

complaint, and the ALJ must explain his rejection of same. *Id.*; *Burnett*, 220 F.3d at 122. The ALJ is required to assess the intensity and persistence of a claimant's pain, and determine the extent to which it impairs a claimant's ability to work. *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999). This includes determining the accuracy of a claimant's subjective complaints of pain. *Id.* However, while pain itself may be disabling, and subjective complaints of pain may support a disability determination, allegations of pain suffered must be consistent with the objective medical evidence on record. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985); *Burnett*, 220 F.3d at 122.

Here, the ALJ thoroughly discussed Plaintiff's subjective complaints and limitations, but determined that the objective evidence on record did not support her allegations. As pointed out by the ALJ, the veracity of Plaintiff's complaints of pain and limitation had been called into question by her treating physical therapists. (R. at 58 – 59). Treatment notes indicated Plaintiff exaggerated her pain and physical symptoms. (R. at 58 - 59). There was no evidence that she had ever been treated for fibromyalgia. (R. at 59). There was no evidence to support her claim that she needed to lie down daily – as per doctor's orders. (R. at 60). Her activities of daily living[11] were fairly extensive, and included driving five to six days a week. (R. at 60). This constituted substantial evidence in favor of the ALJ's determination that Plaintiff's subjective complaints were not entirely credible.

---

[11] Incidentally, Plaintiff argues that her activities of daily living were not relevant evidence of Plaintiff's functional limitations. However, the argument is misplaced. The ALJ utilized Plaintiff's activities of daily living to question the credibility of her subjective complaints of pain and limitation. The ALJ is permitted to do this, and activities of daily living are relevant evidence for this purpose. *Seaman v. Soc. Sec. Admin.*, 321 Fed. Appx. 134, 135 (3d Cir. 2009) (citing *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999)). *See also Thompson v. Halter*, 45 Fed. Appx. 146, 149 (3d Cir. 2002) ("Here, the objective medical evidence, the evidence that [claimant] only stopped working because her company lost its cleaning contract with TV Guide, the evidence that she worked as a cleaner after her layoff, and the *evidence of her activities of daily living* constituted substantial evidence that Thompson could do her past relevant work as a cleaner. Thus, the ALJ properly found that Thompson was not disabled.") (emphasis added).

Plaintiff's third argument asserts that the ALJ did not accord proper weight to the medical opinions of Plaintiff's treating medical professionals. This assertion is not borne out, however. The Court of Appeals for the Third Circuit has held that a treating physician's opinions may be entitled to great weight – considered conclusive unless directly contradicted by evidence in a claimant's medical record – particularly where the physician's findings are based upon "continuing observation of the patient's condition over a prolonged period of time." *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008); *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (citing *Rocco v. Heckler* 826 F.2d 1348, 1350 (3d Cir. 1987)). However, a showing of contradictory evidence and an accompanying explanation will allow an ALJ to reject a treating physician's opinion outright, or accord it less weight. *Id.*

As explained by the ALJ, Dr. Kcompt's assessment of Plaintiff was internally inconsistent, and was inconsistent with earlier treatment notes that did not indicate the same severity of psychological deterioration as later claimed. (R. at 60). His decision to attribute little weight to the findings of Dr. Kcompt was not, therefore, unreasonable. Further, Dr. Schiller found Dr. Kcompt's findings to be an overestimation of Plaintiff's functional limitations. (R. at 60, 364 – 67). Dr. Craig's assessment was, in fact, given significant weight to the extent it was not inconsistent with the record. (R. at 59 – 60). The ALJ disregarded the GAF score[12] of 45 assessed by Dr. Craig, because it suggested a degree of limitation that was inconsistent with the

---

[12] Plaintiff also briefly argues that it was error for the ALJ not to discuss two other GAF scores found in the medical record: a score of 20 following a mental health hospitalization in 2003, and a score of 50 following a mental health assessment in 2008. (R. at 204, 387). Plaintiff fails to indicate how these scores illustrated greater limitation than was found by the ALJ in his RFC assessment. If anything, the rise in the scores over time – from 20 to 45 to 50 – shows improvement in Plaintiff's mental state. Moreover, the Court of Appeals for the Third Circuit has held that a GAF score of 50 indicates that a claimant can perform some substantial gainful activity. *Hillman v. Barnhart*, 48 Fed. Appx. 26, 29 n 1 (3d Cir. 2002). Finally, in light of the lack of a significant history of longitudinal GAF scores, and a lack of explanation of Plaintiff's GAF scores by the sources providing the scores, this court will not remand. *Coy v. Astrue*, 2009 WL 2043491 * 14 (W.D. Pa. July 8, 2009) ("The failure to mention the scores specifically does not constitute reversible error. The Court declines plaintiff's invitation to remand . . . so the ALJ can insert the GAF scores into his decision.").

severity of his written findings. (R. at 59 – 60). In light of the written findings, this was not unreasonable.

Lastly, Plaintiff argues that the lack of substantial evidence supporting the ALJ's conclusions rendered his hypothetical questions and RFC assessment inadequate. In light of the above discussion, it is clear that the ALJ provided a thorough analysis of the medical evidence underlying Plaintiff's claim for disability benefits. Having provided significant record evidence to support his findings, this court can conclude nothing other than that all the credibly establishing medical impairments suffered by Plaintiff were properly incorporated into the hypothetical to the VE by the ALJ, and were accommodated fully in the ALJ's RFC assessment. Therefore, the ALJ's hypothetical and RFC assessment were not flawed.

## VI. CONCLUSION

Based upon the foregoing, the decision of the ALJ is adequately supported by substantial evidence from Plaintiff's record. Reversal or remand of the ALJ's decision is not supported. Accordingly, Plaintiff's Motion for Summary Judgment is denied, Defendant's Motion for Summary Judgment is granted, and the decision of the ALJ is affirmed. An appropriate Order follows.

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Dated: July 27, 2011
cc/ecf: All counsel of record.